## Johnson v. Commonwealth.

Jan. 12, 1945.

Jasper H. Preece for appellant.

Eldon S. Dummit, Attorney General, and H. K. Spear, Assistant Attorney General, for appellee.

OPINION OF THE COURT BY JUDGE THOMAS—Affirming.

The appellant, Mont Johnson, at his separate trial, was convicted in the Martin circuit court of one of the offenses denounced in section 1166 of Baldwin's 1936 Edition of Carroll's Kentucky Statutes (the same being section 435.170, KRS); i. e. maliciously cutting and stabbing Roma James, which occurred late on the night of April 22, 1944—the scene being some 75 yards past the residence of Babe Fannin, an aunt of the victim. The punishment prescribed in the verdict was seven years confinement in the state penitentiary, and from the judgment pronounced thereon appellant prosecutes this appeal.

Though several grounds were stated in the motion for a new trial—but which did not include any complaint of the giving and refusing instructions—only one ground is argued in brief of appellant's counsel, and which is that the verdict is so flagrantly against the evidence as to require a directed verdict of acquittal for his client which requires that we consider only the evidence in the case.

Some mile or more above the residence of Babe Fannin there is a building designated in the record as

148

"Pack Bottom Church", which is located along the bank of Rock House Creek. Appellant and three or four companions from his immediate neighborhood attended the church meeting held in the building referred to at an earlier hour on that evening. The prosecuting witness, Roma James, and two girls about the same age as himself, attended the services held that night in the church, or school house (as some witnesses called it), as did also many others. The two young ladies were Amy Robinson and Blanche Maynard. When the services were concluded appellant—whose home was in the opposite direction from that of the prosecuting witness and that of the two young ladies,—approached one or both of them and requested that they permit him to escort them home which they each refused. However, they did agree for James to escort them home, and he and they, followed by others, including appellant and one or two others who came with him to the church, started walking down the road toward both the homes of James and that of his female companions. Along the route from the church to the home of Babe Fannin appellant and his joint defendant in the indictment, Orvel Maynard, followed closely behind James and his two young lady companions. They began as soon as the caravan left the church to make insulting and more or less threatening remarks toward James in which they said they had whipped five or six boys that night and were going to whip another one, and likewise employed abusive and profane language toward James which he endured until he arrived about one mile from the church in front of the residence of his aunt, Babe Fannin, when he went into her house and procured a pistol and put it under his belt.

The momentary delay while he was procuring the pistol seems to have stopped the crowd and when he returned with the pistol he resumed his position with the two young ladies and continued the journey. A witness testified that just before that he saw the two defendants start in a run toward James—they having continued their abusive language concerning and toward him and saying, in substance, "Come on, boys, lets get him" or "Let's take that pistol away from him". At that juncture James stopped and said "Boys, I have stood enough of this", whereupon the two defendants in the indictment struck and stabbed him, inflicting wounds requiring 55 stitches to close. There was also testi-

mony by the Commonwealth that before inflicting the wounds with a knife appellant struck James with his fist and his codefendant Maynard struck him with a stick resembling a blackjack.

In the meantime James, after being assaulted, managed to get his pistol from under his belt and struck appellant with it in the face, and in so doing the pistol fired, according to the testimony of both James and appellant, which the former stated was accidental and not intentional on his part. At any rate it inflicted no harm to any one. In the scuffle James dropped his pistol and it fell over the bank into the creek. Upon the firing of the pistol each defendant ran from the scene. At a short distance therefrom, and in the direction that each of them ran, was the home of Charlie Bowen and wife, Sallie Bowen. Appellant entered their home and asked for a drink of water. They each stated that he was considerably intoxicated and that each smelled whiskey when he entered their home. They also testified that after being furnished the water appellant stated that "He had a racket and cut the James' boy's head off" and left him laying in the road. There was also evidence that there was some kind of controversy or dispute down at the church at the rear of the building before the close of the service at which both James and appellant were present, but they do not appear to have engaged in any combat between themselves. Such in brief is the evidence adduced by the Commonwealth, and it unmistakably shows that appellant and his codefendant were jealous and irritated, even to the extent of anger because they had failed to be accepted as escorts of the two young ladies to their homes and were supplanted by the prosecuting witness, James.

The testimony adduced by defendants in the indictment was that the prosecuting witness upon protesting their conduct and remarks toward him, drew his pistol and started toward appellant as though he intended to shoot him, whereupon appellant drew his knife and inflicted the wounds on the witness as above described. He was corroborated by the testimony of his codefendant who also claimed, that he (codefendant) did not participate in any manner in the affray, although the testimony of the Commonwealth was to the contrary. One or two other witnessses corroborated that defense, at least to some extent, but the proof as a

whole made out a clear case where the jury had the right to accept the testimony of one side in preference to that of the other, which has been reiterated by this and other courts from the beginning of their functioning as such. The same is also true that in cases where the testimony is anything like evenly balanced a reviewing court will not disturb the finding by encroaching upon the functions of the fact-finding body.

However, in this case we are convinced, after carefully digesting the testimony, that the jury was amply justified in reaching the conclusion that the two defendants in the indictment eagerly and pressingly invited the prosecuting witness to resent what they were doing and saying concerning him, enroute from the church to the point where the offense was committed. They exhibited a temperament, or disposition, to do the prosecuting witness harm upon the slightest provocation, and they belabored themselves to produce that provocation. Appellant is therefore not entitled to shield himself behind the protest of his victim when he, himself, in connection with his codefendant, furnished the grounds for such protest. James and his supporting witnesses testified that he had not drawn his pistol at the time he made the protest to defendants, nor did he at that time move toward him, but on the contrary they immediately assaulted him, and that his pistol was not drawn from under his belt where he had placed it until after the fight had commenced.

In relating the testimony we have not followed the plan of stating what each witness said, but contented ourselves with giving the substance of the testimony in its entirety so as to develop the issue to be determined by the jury. We have concluded that its verdict is amply supported by the proof heard and that the only point argued in brief is insufficient to authorize a reversal. Wherefore, the judgment is affirmed.